J-A27034-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| LOUIS F. RUIZE | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| LORI ANN RYAN-RUIZE | : | |
| | : | |
| Appellant | : | No. 1472 EDA 2021 |

Appeal from the Order Entered June 25, 2021
In the Court of Common Pleas of Northampton County Civil Division at
No(s):  C-48-CV-2019-08982

BEFORE:  PANELLA, P.J., DUBOW, J., and McCAFFERY, J.

MEMORANDUM BY DUBOW, J.:                **FILED JANUARY 26, 2022**

Appellant, Lori Ann Ryan-Ruize ("Mother"), appeals from the June 25, 2021 order entered in the Northampton County Court of Common Pleas that, *inter alia*, denied Mother's relocation petition requesting permission to move to New Jersey with eight-year-child, S.A.R. ("Child"), the biological child of Mother and Appellee, Louis F. Ruize ("Father").  Mother challenges the trial court's analysis of the custody relocation factors, arguing that the trial court did not afford the proper weight to much of the evidence and that the trial court's findings are unsupported by the record.  Upon review, we affirm on the basis of the trial court's June 25, 2021 Order of Court and Statement of Reasons ("Opinion").

The Honorable Stephen G. Barratta, sitting as the trial court judge, has authored a thorough and accurate procedural and factual history spanning twenty-seven pages, which we adopt as our own.  *See* Trial Court Opinion,

filed 6/25/21, at 3-30. In sum, Child was born in January 2014, parents married in January 2018, and on December 15, 2020, the parties divorced. The proceedings leading up to the divorce were highly contentious, with Mother and Father filing various competing petitions for protection from abuse ("PFA"), custody, and contempt.

Relevant to this appeal, on September 24, 2019, Father filed a Complaint for Divorce including a request for custody, and Mother responded by filing a counter-claim. On January 16, 2020, the parties entered an Interim Custody Order which awarded both parties legal custody of Child, Mother primary physical custody of Child, and Father partial physical custody of Child on alternating weekends and every Tuesday for dinner. On August 31, 2020, Mother served a Notice of Proposed Relocation on Father requesting permission to move with Child to South River, New Jersey to live with Mother's friend as well as the friend's husband and teenage son, which Father opposed. On October 23, 2020, Mother filed a Petition for Modification (Relocation). The parties agreed to participate in co-parenting counseling while the petition was pending. On March 17, 2021, Mother served Father with an Amended Notice of Proposed Location, requesting to move with Child to South Amboy, New Jersey, to live with Mother's fiancé, which Father likewise opposed. On May 5, 2021, Mother filed an Amended Petition for Modification (Relocation).

The trial court held hearings on the amended relocation petition on May 11, 2021, May 12, 2021, and June 3, 2021.[1] The trial court heard testimony from Child and parents, as well as Mike Daniels, MSW, LCSW, co-parent counselor; Soly Ruiz, Father's mother; Krystal Frank, Mother's adult daughter; Cynthia Corticeiro, Mother's friend; and Alan Heisinger, Mother's fiancé. On June 25, 2021, the trial court entered an order, which denied Mother's request to relocate and amended the existing interim custody order to provide Father with visitation for three nights every other weekend and additional time with Child during the summer months.

Mother timely appealed and filed a contemporaneous Pa.R.A.P 1925(b) statement pursuant to Rule 1925(a)(2)(i). In lieu of a responsive Rule 1925(a) opinion, the trial court relied on its forty-eight-page June 25, 2021 Opinion issued at the time of its decision.

Mother raises a sole issue for our review in her Statement of Questions Involved: "Did the trial court commit an error of law and abuse its discretion by concluding that Mother should not be allowed to relocate out-of-state with [] Child, contrary to the testimony and evidence at time of trial?" Mother's Br. at 7.

"We review a trial court's determination in a custody case for an abuse of discretion, and our scope of review is broad." **S.W.D. v. S.A.R.**, 96 A.3d 396, 400 (Pa. Super. 2014). This Court must accept the findings of the trial

---

[1] The trial court Opinion inadvertently lists the May trial dates as May 11, 2019 and May 12, 2019 rather than May 11, 2021 and May 12, 2021.

court that the evidence supports. *Id*. Importantly, "[o]n issues of credibility and weight of the evidence, we defer to the findings of the trial judge who has had the opportunity to observe the proceedings and demeanor of the witnesses." *K.T. v. L.S.*, 118 A.3d 1136, 1159 (Pa. Super. 2015) (citation omitted). We can interfere only where the "custody order is manifestly unreasonable as shown by the evidence of record." *Saintz v. Rinker*, 902 A.2d 509, 512 (Pa. Super. 2006) (citation omitted).

A trial court must "delineate the reasons for its decision when making an award of custody either on the record or in a written opinion." *S.W.D.*, 96 A.3d at 401. *See also* 23 Pa.C.S. § 5323(a) and (d). The Custody Act requires a trial court to consider the Section 5328(a) custody factors when "ordering any form of custody." 23 Pa.C.S. § 5328(a). Likewise, a trial court must consider ten relocation factors when deciding a petition for relocation. 23 Pa.C.S. § 5337(h). Any party proposing a child's relocation has the burden of establishing that the relocation will serve the best interest of the child. 23 Pa.C.S. § 5337(i)(1).

When reviewing child custody matters and the trial court's consideration of the Section 5328(a) custody and Section 5337(h) relocation factors, our paramount concern is the best interests of the child. *Saintz*, 902 A.2d at 512. "The best-interests standard, decided on a case-by-case basis, considers all factors which legitimately have an effect upon the child's physical, intellectual,

moral, and spiritual well-being." **D.K.D. v. A.L.C.**, 141 A.3d 566, 572 (Pa. Super. 2016) (citations omitted).

In the sole issue identified in her Statement of the Question Involved, Mother avers generally that the trial court abused its discretion when it denied Mother's petition to relocate with Child. Mother's Br. at 7. However, in the Argument Section of her Brief Mother presents twelve sub-arguments, which are also enumerated in her Rule 1925(b) statement, challenging the trial court's findings and the weight of the evidence. **See id.** at 19-49. Specifically, Mother argues that the trial court did not give sufficient weight to her allegations of abuse by Father, her parental duties, her fiancé's testimony, and Child's preference. **Id.** at 25, 27, 37, 38. Mother also argues that the record does not support the trial court's findings that Father is more committed to Child's education, relocation would have a negative impact on Father's relationship with Child, Mother's fiancé is her "sugar daddy," and relocation would not benefit Child and/or be in her best interest. **Id.** at 19, 28, 30-31, 32-33, 34-35, 41.

After thorough review of the record, the parties' briefs, the applicable law, and the trial court's well-reasoned and thorough Opinion, we conclude that there is no merit to the issues that Mother has raised on appeal.[2] The

_____

[2] To the extent that Mother asserts that that the trial court based its decision on numerous incorrect factual conclusions, **see** Mother's Br. at 46 and Rule 1925 Statement at ¶ 12, we find this argument to be waived because Mother
*(Footnote Continued Next Page)*

trial court engaged in an analysis of each of the Section 5328(a) custody factors and Section 5337(h) relocation factors and made specific findings regarding each factor, which the record supports. **See** Trial Ct. Op. at 33-42. Accordingly, we affirm on the basis of the trial court's June 25, 2021 Opinion. **See id.** at 1-48 (finding Father to be more credible than Mother, finding all Section 5337(h) relocation factors to be against granting the relocation petition, and concluding that Mother failed to meet her burden that relocation was in Child's best interest). All parties are instructed to attach a redacted copy of the June 25, 2021 Opinion to all future filings.[3]

Order affirmed.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/26/2022

---

failed to specifically identify the factual conclusions in her Rule 1925(b) Statement. **See Commonwealth v. Vurimindi**, 200 A.3d 1031, 1038 (Pa. Super. 2018) (explaining that a Rule 1925(b) statement which is too vague to allow the court to identify the issues raised on appeal results in waiver).

[3] **See** I.O.P 424(A) (requiring redaction of a minor's name, address, birth date, and other information that would permit identification); 210 Pa. Code § 65.44.

IN THE COURT OF COMMON PLEAS OF NORTHAMPTON COUNTY, PA
CIVIL DIVISION –LAW

LOUIS F. RUIZE
         Plaintiff

   Vs

LORI ANN RYAN-RUIZE
         Defendant

: No. 2019-08982
:
:
:
:
:
:
:



## ORDER OF COURT

AND NOW, this 25 day of June, 2021, after a Non-jury custody trial, we enter the following Order:

1. Mother's Petition for Relocation filed on May 5, 2021, is **DENIED**.

2. Father's Petition for Contempt filed on August 4, 2020 is **DENIED** as *MOOT*.

3. Father's contempt Petition for Modification filed on August 4, 2020, is **GRANTED**; therefore, we modify Paragraphs (2) and (4) of the existing Order entered on January 16, 2020, as follows:

    **2. Physical Custody.** Mother shall have primary custody subject to Father's periods of partial custody on alternating weekends from Friday after school with Father picking Child up at school until Monday morning, with Father delivering Child to school.

    In addition, Father shall have a dinner visit every Tuesday, from after school, with Father picking up at school and delivering Child at 7:00 p.m. If there is no school on a Friday or a Tuesday, Father shall pick up Child on Monday at 3:00 p.m. All exchanges of Child shall occur at the Washington Township Police Station, 1021 Washington Boulevard, Bangor, PA 18013 (the "police station").

1

In addition, Father shall have custody every year from December 28 at 9:00 a.m. until December 30 at 5:00 p.m.

If a party will be unable to exercise his or her custody periods or if a party will be more than 15 minutes late for a custody exchange that party shall provide the other party with as much advance notice as reasonably practicable under the circumstances. If conditions permit, such notice shall be sent by email or text message.

Paragraph 2 shall be implemented from the beginning of school until July 1 each year. The period of July 1 through the beginning of school year, shall be governed by paragraph 4 as set forth below.

...

4. **Vacation.** The parties shall rotate custodial summer custody in one week increments with Father commencing his visitation this year on Saturday, July 3, 2021, for a one week period, beginning at 9:00 a.m. with delivery to Mother on July 10, 2021, at 9:00 a.m. at the police station. Thereafter, Mother shall have one week of uninterrupted summer visit with Child. Father's second week of summer vacation shall begin on July 17, 2021, at 9:00 a.m., with delivery to Mother on July 24, 2021, at 9:00 a.m. for Mother's weekly visit. Father shall enjoy 2 such weekly visits in August on this alternating schedule. Thereafter, after Mother exercises her fourth period of one week of uninterrupted custody, which would be on the 8th week ending Saturday, August 28, 2021, the parties will revert back to the schedule set forth in paragraph 2. It is the intent of this Order to give each parent, over an 8 week period during the months of July and August, shared alternating weeks of uninterrupted custody during the school year summer vacation.

All other provisions of the Custody Order dated January 16, 2020, remain in full force and effect.

2

## STATEMENT OF REASONS

### Procedural and Factual History

This is a custody dispute between the parties involving their daughter, S.A.R. ("Child"), who was born in January of 2014.

By way of background, the parties were married on January 15, 2018. Louis F. Ruize ("Father") filed the divorce complaint with a count for custody under this docket number on September 24, 2019. At that time of Father's filing, the parties had been participating in marriage counseling with marriage counselor, Bernadette Gaumer, and they were still residing together in the marital home. Within days the wheels fell off the bus, so to speak.

On Sunday, September 29, 2019, Lori Ann Ryan-Ruize ("Mother") requested emergency PFA relief before a Magisterial District Judge. Upon obtaining her temporary PFA Order, Father was evicted from the marital home. Mother and Child continued to reside in the martial home without Father. September 29, 2019, is the date of separation.

The next day, September 30, 2019, the parties filed competing PFA's against each other at our Courthouse.

With regard to the contemporaneous PFA filings, Father's was docketed first at C-48-PF–2019-854 and Mother's at C-48-PF–2019-855. Father obtained a Temporary Order in his favor, but he was not granted possession of the martial home. Father's allegations against Mother included alleged threats that Mother would bury him in the backyard, "F*ck me in the ass", and that she told me that she wanted to punch me.

3

Father also alleged that the month prior to the event, Mother spit on him twice and shoved him in the kitchen. He also claimed that there were past incidents of arguments between the two. Father's Petition did not seek temporary custody of Child.

With regard to Mother's PFA Petition, Mother alleged the parties' marriage counselor called Mother telling her that during Father's individual session with the counselor, Father had made concerning statements suggesting that he wanted to shoot or kill mother. Mother also made other, general, and undated claims of suicidal threats made by Father, Father was on anti-depressants, Father was "sexually abusive", Father secretly taped Mother during sexual encounters, on one occasion Father threw her to the floor, and Father screamed at her. Mother's Temporary Order granted Mother both exclusive possession of the marital home and sole custody of Child.

Final hearings on both petitions were set for October 11, 2019. On October 11, 2019, Father agreed to withdraw his PFA, in return for an alternating weekend (Friday to Sunday) visitation schedule with Child. The Interim Custody Order was docketed in PF - 2019 -- 855. The parties also agreed to enter into a one year extension order for Mother's temporary order, thereby avoiding a hearing. Finally, Mother agreed to vacate the marital home, as Mother and Child moved to Mother's present home at 409 Pennsylvania Avenue, Bangor, Pennsylvania. Thereafter, Father resumed occupation of the martial home.

Also on October 11, 2019, Mother filed her first and indirect criminal contempt petition against Father alleging that on September 29, 2019, as she was sitting in her car in the Courthouse parking lot, she claims to have seen Father recording her on his cellphone, in violation of the temporary PFA. The October 11th contempt petition was

4

the first of many petty filings regarding perceived violations of both the PFA and custody orders governing the parties' behavior. The next PFA contempt complaint was filed by Father four days later on October 15, 2019, alleging that Mother failed to allow Father to have his first scheduled weekend visit.

On October 22, 2019, Mother filed her counterclaim for custody.

Mother filed another Complaint for Indirect Contempt of the PFA two (2) days later on November 12, 2020, alleging that Father drove by her house. The contempt was dismissed at a hearing on November 25, 2020.

Mother's final hearing was not held until November 10, 2020, the testimony supporting the PFA Petition, came from the parties marriage counselor, Bernadette Gaumer. According to Ms. Gaumer, during her September 27, 2019 counseling session, Father noted several different ways, that if he were to shoot Mother in his home, it would be a non-issue because he could have done it "accidently" or he could have thought she was a robber and that he was under attack. Ms. Gaumer testified that she had a heightened alarm with regard to Father's statements because he provided her with three (3) different scenarios for how he could "accidently" shoot Mother in their home. Finally, because Ms. Gaumer believed that Father had a gun in the home, she was concerned about Mother's safety, so after the counseling session, Ms. Gaumer called Mother to warn her regarding Father's statements. As a result, Mother applied for an immediate PFA alleging Ms. Gaumer's concerns.

Based on Ms. Gaumer's testimony, a final PFA Order for three (3) years was granted in favor of Mother on November 10, 2020.

It is hard to be certain, as the docket in PF - 2019 – 855 was quite active for a year period, but there appears to be a total of four PFA contempt petitions filed by the parties (only one granted affirmative relief, a $100.00 fine against Father), two motions for reconsideration of PFA orders, and an appeal to the Superior Court. All of the PFA litigation has been resolved, as the only active Order remains the final Order entered on November 10, 2020.

At their first custody conference held January 16, 2020, the parties entered into an Interim Custody Order providing Mother with primary physical custody, with Father having partial custody on alternating weekends from Friday after school until Sunday at 6:00 p.m., and every Tuesday for a dinner visit after school until 6:00 p.m. The Order also directed that the parties engage in co-parenting counseling.

With regard to this custody dispute, on August 4, 2020, Father filed a Petition for both Contempt of the January Custody Order and for modification. The Contempt Petition alleged several missed visitation periods - both weekend and dinner visits during the Covid pandemic, an inability to have consistent telephone and internet "video chats" with Child, failure by Mother to provide information regarding Child's activities, late delivery or release of Child for visits, failure to provide Child's homework so that Father can assist Child during his visits, and other perceived custodial insults for which Father sought a finding of contempt, an award of counsel fees, and other relief that court may find appropriate. In his Petition to modify, Father referenced his concern about Mother's attempts to "thwart" his relationship with Child and raised a concern that Mother may attempt to relocate to New Jersey, therefore, Father sought equally shared or primary custody of Child.

6

Mother then filed her first Modification (Relocation) Petition on October 23, 2020. The Notice of Intention to relocate provided an intended address of 4 Edgewood Street, South River, New Jersey which was the home to Cynthia ("Cynth") Coons Corticeiro – friend, Carol Corticeiro – husband, and Gavin Corticeiro – age 16.

Unsurprisingly, Father filed his opposition to the relocation.

The Petition for Relocation was assigned to the undersigned and on October 26, 2020, we set a non-jury trial for December 7, 2020, with a pretrial conference/settlement conference set for November 18, 2020. At the settlement conference, we reviewed with counsel the basis for the relocation. We inquired about the lack of information in Mother's notice (no reference to employment or other financial benefit; a targeted relocation not to family or a new spouse, but to a married friend's home; no reference to stability for Child; no reference to the impact on relocation on the Child's best interests). Mother's counsel then indicated that the matter was not ripe for disposition for trial, so the matter was continued by agreement of counsel to the February 22, 2021 non-jury trial list. In the meantime the parties were diverted to the Custody Master to address outstanding issues. On December 9, 2020, the parties agreed to an Interim Order before the Master to attend co-parenting with Philip Rusche, enroll Child in individual counseling (play therapy) with Ann Friedenheim pending the February 22, 2021 trial date.

Prior to the February trial, Mother's counsel indicated that Mother was abandoning her October 2020 relocation petition, so the parties agreed to strike the February trial listing. Mother's counsel then withdrew his representation, immediately thereafter, Mother's new counsel entered her appearance.

7

Mother filed second Amended Petition for Modification (relocation) on May 5, 2021, presenting new place for relocation, in the home of her now alleged fiancé, Alan F. Heisinger, Jr., who resided by himself at 245 Gerghety Street, South Amboy, New Jersey.

It is hard to be certain due to the high volume of filings under the PFA docket, but there appears to be four PFA contempt petitions filed by the parties, in addition to two motions for reconsideration of PFA orders, the entry of several interim PFA orders to resolve minor disputes, and an appeal to the Superior Court. With regard to custody, the parties have filed several competing custody modification petitions, including the two separate relocation petitions filed by Mother, and two unsuccessful attempts at co-parenting counseling with two different providers, and Father's contempt petition. A review of the various court filings indicates that the parties have raised many petty complaints against each other. Based on a review of the various pleadings filed in both the custody and PFA dockets and given the antagonistic testimony of the parties at the non-jury trial, it is not unreasonable to label these parties as "high conflict" litigants.

However, in the parties favor, we note that they were successful in reaching an agreement to divorce, with their Decree entered on December 15, 2020.

We commenced the relocation trial on May 11, 2019, continued with it on May 13, 2019 and finished it on June 3, 2021. Thereafter, the parties were given 10 days to submit briefs or suggested orders.

We also note that the delay in resolving all of the outstanding petitions resulted from various continuances granted at the request of the parties.

8

Prior to commencing trial, we noted that we were accepting and making part of the record, the reports of the two co-parenting counselors - the Daniels report dated August 10, 2020 and the Rusche report dated April 21, 2021.

At the trial, the Child was the first witness to testify. Child testified in chambers with counsel present. Child was very comfortable and candid with the Court. She is currently in first grade, does well in school; however, she acknowledged that she is having difficulty with reading.

With regard to her relationship with her parents, Child indicates that she is comfortable in both households. She raised no complaints with either household with regard to her relationship with her parents, the people in the respective houses, or her care in either home. Child indicates that both parents spend time with her and assist her with her school work.

Child indicates that she has several friends who she sees and plays with when she is at her Mother's home. Child also testified that Mother often takes her to New Jersey to visit her Mother's friends and that she has a good relationship with Mother's friends, specifically she referenced Alan and Cynth (who we took to be Cynthia). Apparently, the New Jersey visits are generally at Cynth's house. Child reports that she enjoys visiting in New Jersey. Child also reported that Alan and Cynth often come to visit Mother in Bangor.

With regard to Father's home, Child indicates that Father lives with Maternal Grandmother who has her own room. Child indicates that she has a good relationship with Maternal Grandmother. Child also noted that Maternal Grandmother spends a large portion of her visits in her room by herself. It was apparent from Child's testimony,

9

that during her visits to Father's home, Child interacts mainly with her Father. Child testified that her Father plays with her and that she is comfortable with Father.

Child was asked about where she sleeps in each parent's home. Child has her own bedroom at Father's house. She also has a bedroom at Mother's house, however, by Child's own account, she often sleeps with her Mother in her Mother's bed. Because we were aware that Mother reported that she now has a fiancé and that minor Child is aware of his presence in her Mother's life, we asked were Alan sleeps when he visits Mother's home, Child reported that Alan does not sleep with her Mother, but sleeps on the couch. When we asked about Alan's relationship with Mother, Child told us that Alan is not her Mother's boyfriend.

When asked about her custody situation, Child indicated her preference is to remain with Mother. It was apparent to the Court, that Mother's lifestyle offers Child social interaction that is not available at Father's home as Child reports not to have any friends who visits her in Father's house, so she is apparently left to interact with Father through her visitation periods. When pressed about expanding time with Father, Child did not support expanding her visits with Father.

The parties' first co-parent counselor, Mike Daniels, provided counseling from January 23, 2020 through March 28, 2020. Mr. Daniels testified as Father's witness. Mr. Daniels also had the opportunity to spend some time with daughter and the parties. Mr. Daniels noted that daughter appeared energetic and confident when she attended the session with Father. However, Mr. Daniels testified that Child's demeanor was different with Mother, in that Child appeared more "immature". In particular, Mr. Daniels noted that with Mother, Child presented to be "shy and coy" and began the session

10

meowing instead of speaking until she felt more comfortable.

With regard to the co-parenting counseling, Mr. Daniels indicated that the parents have different goals. Mr. Daniels also noted that Father was more interested in co-parenting issues and was seeking to increase his time with daughter. According to Mr. Daniels, Mother appeared to be processing trauma, from both her alleged reaction to the domestic violence issues with Father and also her own medical issues. Mother also appeared more hesitant and fearful to engage in co-parenting. Other times, Mother was inappropriately aggressive and accusatory with regard to Father and his past behavior. Further, Mr. Daniels described Mother as dictating to Father rather than discussing issues.

Mr. Daniels suggested that Father seemed to be more receptive and interested in successful co-parenting, while Mother appeared to be resistive to Father's efforts to spend more time with Child. Mr. Daniels also testified that Mother's communication with both himself and Father during sessions and via test messages was aggressive and/or angry. As examples, Mr. Daniels referred to Mother's text message of 7/23/00 (which was negative and critical towards Father regarding counseling sessions). Mr. Daniels described the text message as unfair and not accurate with regard to Father's demeanor in counseling, as according to Mr. Daniel's, Father had always been respectful and appropriate during counseling. Mr. Daniels also referenced another example during a counseling session when Mother was angry with Father because Father presented daughter with a pink breast cancer awareness pin in support of Mother's situation. Mother accused Father of breaching his co-parenting responsibilities by providing daughter with the cancer awareness pin without first asking her and

11

receiving her permission. Mr. Daniels did not understand Mother's anger towards Father over the breast cancer pin.

Mr. Daniels described Father as having a healthy relationship with Child and appropriate with regard to his interaction with Mother. In fact, Mr. Daniels noted that Father repeatedly referred to Mother as a good mom. On the other hand, Mr. Daniels described Mother as being not supportive of Father. According to Mr. Daniels, Mother refused to allow Father to have make up time when Father was unable to exercise custody because of Mother's emergencies.

Finally, Mr. Daniels noted that moving to New Jersey was never brought out during co-parenting counseling by Mother.

In conclusion, Mr. Daniels was supportive of expanding Father's custodial periods with Child.

Paternal grandmother, Soly Ruiz, also testified on behalf of father. We note that grandmother spells her name differently than Father (as according to father, he spells his name in the traditional Spanish version with an 'e' at the end). Grandmother lives with Father at the South Delaware Drive address. She does not work as she is disabled. Grandmother moved into Father's house after the parties separated, apparently to support Father.

Grandmother describes Child as a happy Child, that she is a lot of fun and that she often plays with dolls. Grandmother also opined that Father is a great father. She is proud of him as he is very dutiful and devotes all his time during custody periods to minor Child.

12

Grandmother also testified about several difficult interactions with Mother relating to pick up minor Child. She apparently views Mother as hostile and difficult to communicate with.

The next witness was Louis Ruize. Father is a financial analysis/portfolio manager. His company is based in West Chester, New York. It is approximately a 2-1/2 hour commute to work each way.

Father testified that after the birth of Child, Mother worked at St. Luke's Hospital as a CNA, so the parties relied on daycare for Child. Father testified about the parties' history with regard to providing daycare for daughter, while both worked. It is apparent that for much of her early years, daughter spent full days in daycare, sometimes as much as 12 hours a day. However, in 2017 Mother was diagnosed with cancer and went on leave from her job at St. Luke's Hospital, therefore Mother was able to provide for Child at home.

Father describes daughter as a ball of energy, very affectionate, and intelligent. Father also views Child as very attention seeking, apparently demanding his time during his visits. Although Father described Child as intelligent, he noted that she does struggle with reading which he tries to work with her. He speaks of his weekday dinner visit as basically consisting of dinner and homework with Child. Father also discussed activities that he engages with Child, including playing with dolls. Father was also impressed with S    's creation of a card game which Father described as fairly complex, which they enjoy playing together. When Father was challenged about the perception that Child may be isolated at his home, Father testified that Child does have playmates during his visits, specifically referencing his cousin's Children. However,

13

Father complained that there is not enough time during his limited visits with Child that Child can develop relationships with other kids.

Father testified that he supports S___'s activities including dance and gymnastics. Father also testified that he assisted S___ in getting flowers and a Mother's Day card. Father alleges that he makes S___ available for phone calls with Mother during his visitation time, that he continues to keep Mother apprised of any issues with S___, and that he also utilized Talking Parents as required by the Court Order for communication with Mother, however, Father complains that Mother either fails to respond or is slow to respond.

As far as Father's concerns about Child, Father notes that she possibly may suffer from attention deficit due to her alleged inability to focus. Father also complained that S___ has 10 absences during the school year, and seemingly questions Mother's commitment to S___'s school. He complained that Mother does not always meet her obligation to send Child's homework folder during his visits, even though he has discussed with Mother his desire to be engaged in assisting Child with her school work. Father testified that he had a dispute with Mother with regard to Mother's desire to enroll Child in cyber school, as Father prefers Child to be in person believing that socializing and in person instruction are important factors for Child. Father complains that Mother does not share health information regarding Child. Father's complaints regarding the withholding of information regarding Child's activities include both school and extra circular activities. A related claim raised by Father is that Mother interferes or obstructs his ability to have daily phone contact and video chats with Child, in violation of the Custody Order.

14

Father also questioned Mother's representation to him that S needs to be involved in counseling because Mother believes that S has "narcissistic tendencies".

With regard to co-parenting issues, Father acknowledges that he and Mother do not communicate well. He asserts that he has always been and will remain available to communicate with Mother in order to support Child.

Father also presented a text message from Mother dated September 24, 2019 (Plaintiff's Exhibit 14) in which Mother criticized Father and then apparently taunted him with her ability to pick up and move to New Jersey anytime she wants. Father also presented a photograph (Plaintiff's Exhibit 13) that Mother sent to Father from Child's cell phone depicting their December 2020 Divorce Decree, displayed in a corner of a hallway, in what appeared to be a shrine. The photo depicted the Divorce Decree set on top of a large crystal pedestal and a pink heart with Child's name was hung above the Decree.

Father discussed his concerns about Mother's request for relocation. Obviously, Father is concerned about the distance both for travel and the isolation related to his ability to see Child. Clearly, if Mother relocates with Child, he will lose his ability to have personal contact with Child each week. Father sees himself as more supportive of Child's educational prospects and Father also wants to be available as a resource if Mother is sick and/or unavailable.

Father also indicated that Mother's plans for relocation have shifted as her first Petition was Mother's proposal to live with another family. Father referenced Mother's friend (Cynthia) as a person who Mother used to do drugs with and they got clean together.

15

Now, Father questions Mother's proposed fiancé, Alan. Allegedly, he is a high school friend of Mother, however, Father noted that Mother represented to him in the past that he was "gay". Apparently, Father's complaint about the fiancé is that either Mother is misrepresenting their relationship or that she was deceitful with regard to her friend and her past relationship with him.

Father complaints about Mother's alleged contempts included that he is frequently unable to have his telephone or video visits with Child and he does not receive information about Child that is to be provided under the Court Order. The most serious allegations were that he has missed several visits (both weekend and dinner) due to Mother's decision to "quarantine" Child for COVID concerns. Mother has denied him make-up time. Father also complained that when Mother was unavailable due to a hospitalization for a week period last year, that Mother did not contact him about her illness or allow him to be Child's caretaker. Father also presented a bill for attorney's fees for pursuing contempt and also for defending against the two PFA (2) contempt petitions which were both dismissed, as apparently the allegations did not rise to a contempt and/or Mother could not prove the allegations.

With regard to his modification petition, Father would like shared custody in one week blocks. Father claims that if he were given extended time with Child, that his employer would allow him more flexible work time. Father also noted that his mother lives in the house so she would be available to assist him with Childcare.

On cross-examination, Father claimed that he has never needed to use a babysitter during his visitations, and that if he would have to, his mother and his cousin who lives about an hour away would be emergency Child care providers. Father also

16

acknowledged on cross examination that he is away from the home approximately 14 hours a day (6:00a.m.-8:00p.m.) three (3) days one week and four (4) days the next (7 out of 10 work days).

During Father's testimony there were brief references to the PFA filed by Wife, without much detail about the allegations. After counsel completed the examinations of Father, we inquired with regard the allegations supporting Mother's PFA, specifically the threats made against Mother. Apparently, the threats were not delivered directly to Mother, but delivered to the parties' marriage counselor during a session with only Father and the counselor. Father attempted to explain his communication with the therapist as being conditional statements and/or concerns raised by Father with regard to Mother's behavior. Specifically, Father alleged that Mother had previously threatened him with violence or death and that she had been physically aggressive with him. He feared that she might attempt to break into his home or otherwise attack him and, therefore, he explained to the therapist that he had the ability and was prepared to defend himself against deadly force by Mother by shooting Mother, if he was placed in that circumstance. Father also claimed that the conversation digressed as a result of the numerous questions that the counselor had for Father in an effort to make him explain or clarify his thoughts about Mother. We accept that Father's statements were threatening and support the entry of the PFA.

Mother was our next witness. We would describe Mother's primary mission as an attempt to paint Father as uninvolved and unconcerned about Child and that he is a very violent man who owns numerous guns, that he has a history of abusing Mother, that Father is intent on "murdering" her, and Father should not be allowed expanded

17

custodial time with Child, while at the same time claiming that she has attempted to be supportive and encouraging with regard to Father visiting Child and that if she were allowed to relocate, she would agree to modify the custody schedule so that Father would not lose time, because she understands how important it is for Child to have her father in her life.

Mother's testimony did not provide detail with regard to past abuse within the household, rather the focus of her concerns were Father's threats delivered through the counselor. Mother claims to have PTSD as a result of her victimization by Father. We note that Mother's attitude while testifying was hostile, antagonistic, and aggressive towards Father. Her attitude on the stand confirmed the testimony of Mr. Daniels and Father. Further, while she claimed on one hand that she has tried to accommodate Father and encourages Child to have a relationship with Father, the record supports that there has been supporting evidence in her actions.

Mother currently is unemployed and collecting disability due her cancer treatment. Mother provided no testimony or insight into her finances, but it appears from her testimony that she has no difficulty in supporting herself and Child with whatever income streams are available.

Mother made various complaints about Father either asserting that he is uninvolved with Child or that he has been harassing her regarding custody issues. Mother also attempted to demean Father's parenting skills by using an example where Child had a sore throat while she was with her Father over a weekend and Father gave S a homeopathic remedy of honey and lemon. Mother complained that when Child was returned to her care, she took Child to the doctor and the Child was diagnosed with

18

strep throat. Mother also criticized Father for another occasion where Father acknowledged giving Child a little bit of coffee, as Father was apparently told or believed that caffeine might assist Child in focusing. Father's testimony was that it was only a small amount of coffee that was given to Child to drink and only for the purposes of seeing whether it would be helpful for Child to focus. Father apparently acknowledged his experiment and further it only occurred on one occasion because Mother objected to Father's effort. The Court doesn't know how to react to the coffee complaint, as it seemed *de minimis,* we suspect not that unusual for a parent to allow a Child to try coffee.

Mother also rebutted Father's claim that she appears unconcerned about daughter's reading struggles. Mother claims that she frequently uses a teenage neighbor for both Childcare and tutoring for Child. Apparently, Mother has confidence in her teenage neighbor's skills in providing reading support for elementary aged Children.

Mother also presented a thirteen page summary of phone calls purportedly made and received from "Daddyo" spanning September 6, 2019 through March 3, 2021 (Defendant's Exhibit 19) which Mother testified were all calls made and received by Father and Child from Child's cell phone and the summary was generated from Child's cell phone records (apparently sometime after March 3rd, the phone was no longer in service). We estimate it is approximately 2015 calls, however, many were missed calls or calls which lasted less than 60 seconds, some only a few seconds (leading to believe that the bulk of the calls were missed or went to voice mail). The remaining 30 or so generally lasted several minutes with a handful between 10 and 20 minutes. Mother submitted her summary to prove that Father is getting his telephone contact with Child.

19

The record seemingly supports both positions, while there have been attempts by both sides to contact each other, we can understand Father's complain that his successful rate of contact was disappointing. Ultimately, we see the success rate of phone contact between a father and Child of tender years (while this Child was 6 years under) to be of minor concern for the Court. Of more significance to the Court was during Mother's testimony she asserted that Father harassed her with an unreasonable amount of phone calls and that eventually at or near the time that the phone was taken out of service, Father attempted 27 calls within 30 minutes. Mother presented as very annoyed and angry regarding what she considered Father's abuse of his phone privileges. During the trial we quickly reviewed Mother's Exhibit 19. Yes, the summary indicated that there were several days when Father may have made between two and four or five unsuccessful (identified as missed calls) in a short period of time. The records indicated that it occurred approximately 10 times during the six month period. However, we find that those incidents of several missed calls placed by Father did not support a conclusion that the several missed calls were harassment, nor where there any days when Father made an unreasonably large amount on the summary. We specifically asked about the 27 calls in 30 minutes event, because Mother brought in a stack of telephone records to prove Father's history telephone contact with Child, Mother acknowledged that she had no proof of the alleged 27 calls made within 30 minutes, which apparently happened a couple of months before the trial, was one of the contributing events causing Mother to take Child's cell phone out of service and should have been captured in the very records she had downloaded for trial. Mother was unable to account for the missing confirmation of her claim, in which she exasperatedly

20

claimed that Father's recent cell phone harassment contributed to her decision to shut off Child's phone.

Mother also made other bald complaints about Father, including that she believed that Father follows her, that he was videotaping her, and that one time Father had driven by her home in violation of the PFA. Also, at various times, Mother referenced Father as "mean to me" and "abusive," but she provided little detail in support for those claims, and other than a few incidents of poor and socially unacceptable behavior of Father prior to the break up and the fact that Father made the threats to harm Mother to the marriage counselor, Mother's complaints were without any detail or corroboration.

Mother did present Defendant's Exhibit 5, which was a black Mercedes apparently driven by a male driver, Mother testified that the picture was taken by a friend of hers in a New Jersey beach parking lot. Mother testified that she and Child were also at that beach the day the picture was taken and Mother announced that the driver was Father and that she concluded that he must have come from Pennsylvania to follow her that weekend. Frankly, we carefully reviewed the picture. The windows to the car were closed. The picture was a side or profile picture of the driver. The entire face and head of the driver was darkly shaded and there is an illuminated streak from the suns reflection across the outside of the window, further blurring the image. We cannot argue that it was or wasn't a male (although it is also possible that it was a woman fashioning a shorter hair style), however we submit that no one could be able to positively identify the driver from that photo and we certainly do not agree with Mother's identification. Father wasn't confronted with the photo at trial or the accusation at trial.

21

Mother's theory - that Father, who lives in Pennsylvania, happened to be photographed by Mother's friend on a weekend day, driving through the parking lot of the same New Jersey beach that Mother and Child were visiting, without stopping in the parking lot, without attempting to make contact, and without Father being seen anywhere else that weekend - was another bizarre accusation.

Mother also raised another bizarre allegation that after Mother moved out of the marital home, she left an "old TV" with Father in the marital home. Later, she claimed that she found the TV in a fire house department dumpster a couple of blocks from her home. Mother introduced three photographs in support of her claim (Defendant's Exhibit 6). The first photo was a picture of a dumpster with signage indicating it was a "Bangor Fire Department Aluminum Recycling Bin"; the second a picture of an older styled big box TV, as opposed to newer flat screen TV, lying with the upper left hand corner of the screen peeking out by about 3 or 4 inches over the back wall of a dumpster; in other words the TV was buried in the dumpster with only a couple of inches of the corner of the upper right hand of the TV screen peeking out. The third picture appears to be taken from inside the dumpster with a TV tilted downward (front to back) sitting much higher than preceding photo, with the entire back end of the TV above the sight line of dumpster wall and at least half of the entire TV screen now above the dumpster wall. Clearly, the TV depicted in the two photographs was not in same position as the prior photograph. Thus, if the same TV and dumpster are depicted in both photographs, the two pictures suggest that someone climbed into the dumpster to raise and reset the TV in order to photograph the back of the TV. Even though Mother made this bizarre claim that Father threw out her old abandoned TV in a dumpster located a couple of blocks

22

from her home, there was not testimony about how she came across the TV thrown into a dumpster blocks from her house, why she would conduct an investigation to determine if it was her old TV that she had abandoned in Father's home, why she believed that Father threw it away in an effort to harass her, and why Father might believe that she would somehow come across the buried TV in the dumpster blocks from her house. Besides Mother providing no evidence or theory to support her claim, Father was not asked about the TV during his cross-examination.

Mother testified that she currently collects Social Security disability (although no proof of her income was presented) for her cancer and related neuropathy. There was also testimony that Mother was hospitalized on December 18, 2019, for seven (7) days, and according to Mother's detailed description of how dire her situation was, she allegedly had a blood infection, was in a coma, at risk of death, and doesn't remember much from her hospitalization. Mother submitted hospital records generated from that event. (Defendant's Exhibit 20). A summary of Mother's condition was made on December 19, 2019 by PA-C Covino and attested by Dr. Jahoor, describing Mother's reporting symptoms that on 12/12/2019, Mother had a laparoscopic hysterectomy and that she reported to the hospital on the 18th with complaints of abdominal pain, nausea, vomiting, and "presumed sepsis"... She also has a massive amount of retained stool.... Patient was on antibiotics but we agree that infectious etiology is unlikely. We will stop antibiotics and will focus on treating her constipation. She is getting Miralax twice a day.... On physical exam heart is regular rate and rhythm." On the next page of the report it was anticipated that Mother's stay to be "2 midnights." See medical Records pp.18 – 19. On page 29 of her records, it was noted that Patient also reported on

23

admission that she was doing well after her laparoscopic surgery until "yesterday" and that she "had not had a bowel movement since the surgery." Mother also reported that she was feeling a "little bit better after receiving some IV fluids and antiemetic. She is passing flatus." The records also note that Mother was not discharged until the 23rd. The discharge summary it noted: Patient was admitted initially with what was thought to be sepsis due to possible gastroenteritis. GI was consulted and she was started on antibiotics. It was later deemed that she likely had bowel distension from severe constipation. ....her constipation resolved with laxatives. She did undergo EGD and colonoscopy. EGD showed some mild gastritis and a mild hiatal hernia. Colonoscopy was unremarkable aside from a few scattered diverticula and hemorrhoids. After these procedures she did have some abdominal pain, but it did resolve. She was then discharged home." See Medical Records page 49. So, rather than having sepsis, in a coma, and near death, Mother was diagnosed with discomfort due to constipation caused by a massive stool and after being given an IV and laxatives her condition resolved, she was given precautionary testing (EGD and a colonoscopy) which were unremarkable and she was sent home.

However, Mother's hospitalization was otherwise notable for purposes of this trial, as Father complained that he wasn't notified that Mother was unavailable to care for Child nor was he given the option of providing substitute Childcare during Mother's disability. Mother acknowledged that she did not notify Father until after her discharge from the hospital, claiming that she was so disabled and also comatose, that she was unable to contact Father. Instead, Mother used her Cynthia and her adult daughter to care for Child while she was hospitalized and disabled.

24

Despite her clearly hostile and antagonistic attitude to Father, Mother claims that she has attempted to accommodate Father by allowing him more time without providing any detail or proof of her efforts to rebut Father's claims.

With regard to her first Petition for Relocation filed in October of 2020, we received no testimony during the trial as to why that petition was continued from the December 7, 2020 trial date, with the new date set for February 22, 2021; nor did Mother address the fact that the October relocation petition did not mention her boyfriend (and soon to be fiancé) Alan Heisinger. Mother testified that immediately after continuing the December trial she became engaged to her fiancé and set a marriage date for mid-April 2021. However, Mother did not testify as to why she did not amend her petition to list her fiancé and her plan to relocate to his home in time for her relocation trial then scheduled for February 22, 2021. Thereafter Mother appeared before the custody master on December 23, 2020 asking for an interim order to appoint a "play therapist" for Child, but Mother did not mention her impending marriage. Then on February 4, 2021, Mother again appeared before the custody master and participated with the custody master, counsel for both parties, and Father in an attempt to settle this issue, yet Mother never revealed her engagement, pending wedding in less than two months to Mr. Heisinger. Unsurprisingly, no settlement was reached, but the trial was continued to April 26, 2021. Further, and perhaps even more unsettling, Mother then participated in a second round of co-parenting counseling with Father before Philip Rusche, from January 11 through April 19 2021; yet Mother acknowledged that she never mentioned her engagement, her impending April marriage that was on schedule until after the untimely death of the Father of her fiancé occurring on March

25

31, 2021, just weeks before the ceremony, or the fact that she and her fiancé were planning on Mother's relocation to his home **at anytime** during Mr. Rusche's counseling session. Apparently, Mother did not believe that her engagement, impending marriage, or her changed plans for relocation was information worthy of discussion as a co-parenting issue. Mother was asked and admitted that co-parenting counseling was terminated without any information provided to Father about her engagement. When Mother was questioned about why such an important issue was not raised in co-parenting counseling, Mother alleged that she was too frightened to tell Father because she was afraid that he might try to kill her if she revealed her plans.

We note that Mother's claim of fear of revealing that her relocation plans had changed was not the least bit credible, as two years before, Mother had already sent a text message to Father taunting him that she could petition to go to New Jersey whenever she wanted to and there is nothing he can do to stop her, then in September 2020, she filed her first relocation petition seeking relocation, and after the divorce was finalized in December Mother celebrated the divorce and again apparently taunted Father by sending a picture of the Divorce Decree displayed in the shrine she made at her home. To claim that she was afraid to tell Father of her change in her plan for relocation is not at all credible.

Although this may just be a coincidence, both notices of Mother's intent to relocate were mailed to Father immediately after the termination of co-parent counseling and **neither** report mentions Mother's intention to relocate as an issue raised by Mother in counseling.

We have described the claims related to Child's cell phone records, Mother's

26

hospitalization, Father's alleged beach appearance, the TV found in the dumpster and reviewed Mother's vacillating relocation petitions in detail, because each claim contains an example of the unreliability of nearly all of Mother's claims or theories, as they are either undeveloped, misrepresented and/or made no sense. These claims suggest to us that Mother is an unreliable witness, that she lacks credibility, and as a result, they call into question Mother's motivation for relocation.

Mother called her daughter from her prior relationship, Crystal Frank, to testify. Ms. Frank is now 22 years of age. Ms. Frank testified that her father has had primary custody of her throughout her life, even when Mother resided in New Jersey. However, she also testified, that when her mother and Mr. Ruize relocated from New Jersey to Upper Mt. Bethel, Pennsylvania, Ms. Frank – who attended high school in Old Bridge, New Jersey – would frequently visit on weekends. Ms. Frank estimated that she was between 15 and 18 years of age when her mother was married to Mr. Ruize and she was regularly visiting her mother in Pennsylvania. Ms. Frank claims that Father was not overly involved in Childcare. Ms. Frank testified that primarily Father remained isolated in the house in his office. Ms. Frank further claimed that during her visits, she often took care of her younger sister. Ms. Frank also testified that during their marriage, Mother and Father did not argue in front of her, but she could feel tension in the air.

It was very interesting to us that even when Mother resided in New Jersey, Ms. Frank's father, not Mother, always had primary custody of her.

Cynthia Corticero testified. Ms. Corticero is married, she has a 28 year old daughter and a 16 year old son. Ms. Corticero testified that she has known Mother for approximately 20 years, having met her through church connections.

27

Ms. Corticero was the original target for mother's relocation, in that Mother was invited to live in her home and filed the September 2020 relocation petition identifying Ms. Corticero's home as Mother's place for relocation.

Ms. Corticero testified that she often would visit Mother in Pennsylvania, frequently staying for an entire weekend. Ms. Corticero testified that Father was not very involved in providing care for Child.

Ms. Corticero claimed that she frequently visited at the parties' martial home when Child was very young and that Mother was always the primary caretaker for Child and that often Father would be alone in his home office.

Ms. Corticero knows mother's fiancé, Alan, and that she approves of their impending marriage.

Mother's fiancé, Alan Heisinger testified. Mr. Heisinger is a computer software engineer, specializing in commercial HVAC building applications. Mr. Heisinger testified that he described his occupation as making buildings "smarter".

Mr. Heisinger testified that he knew Mother in high school and that they reconnected in 2009 when Mother was hired to be the caretaker for Mr. Heisinger's grandmother. Mr. Heisinger testified that he currently lives in and now owns his grandparent's home on 245 Gerghety Street, in South Amboy, New Jersey. Apparently, he resided with his grandparents and provided for their care for several years as they became elderly. Mr. Heisinger testified that he was able to reconnect with mother in 2009 on Facebook which apparently resulted in her employment as his grandmother's daily caretaker. They drifted apart again in 2015, after Mother's marriage to Mr. Ruize and reconnected again in 2019.

28

Eventually, in October 2019, shortly after the parties separated, Mr. Heisinger and Mother became boyfriend and girlfriend. In fact, Mr. Heisinger testified that in December 2019, when Mother was hospitalized, he spent the entire hospitalization with Mother at St. Luke's Hospital.

Mr. Heisinger testified that around Thanksgiving 2020, he asked his parents for their support as he was intending to ask Mother to marry him. Because he received his parents' approval, he then asked Mother to marry him in December 2020. Originally, they planned for an April 2021 marriage ceremony, however, Mr. Heisinger's father passed away shortly before the wedding date (March 31, 2021), so the marriage was postponed by agreement until July 25, 2021.

Interestingly, since 2019, Mr. Heisinger has indicated that he has financially supported Mother by providing her with large sums of money for her attorney's fees related to her divorce and custody actions, automobile repairs, the acquisition of a new vehicle for Mother, and other monies for household repairs and expenses. Apparently, Mr. Heisinger has kept a log of his expenditures on Mother's behalf. From September 2019 until he asked Mother to marry him, Mr. Heisinger testified that he provided Mother with over $30,000.00 in financial support. Defendant's Exhibit 25, consists of credit card monthly summaries of charges incurred on behalf of Mother on Mr. Heisinger's Capital One account, from September 24, 2029 through May 7, 2021. Mr. Heisinger indicates that he will continue to support Mother pending their marriage. When asked if he will continue to provide Mother with such significant funding if Mother turned down his December proposal for marriage, Mr. Heisinger said "of course not".

29

Mr. Heisinger indicated that he has a close relationship with both Mother and Child. Mr. Heisinger's work responsibilities will not allow him to relocate to Pennsylvania; therefore his hope is that Mother will move into his home, but if not, he will continue his relationship with Mother, even if Mother remains in Pennsylvania because Child is not permitted to relocate to New Jersey.

We found Mr. Heisinger to be a reasonable, respectful, and genuine person.

## LEGAL STANDARD

Chapter 53 of the Domestic Relations Act, referred to as the Custody Act, requires that when making a custody award, "[t]he court shall delineate the reasons for its decision on the record in open court in a written opinion or Order." 23 Pa. C.S.A. § 5323(d).

"With any Child custody case, the paramount concern is the best interests of the Child." J.R.M. v. J.E.A., 33 A.3d 647, 650 (Pa. Super. 2011). Further, the legislature enacted section 5328(a) of the Child Custody Act in order to delineate "factors that the trial court must consider when awarding any form of custody" in a written opinion or Order. Id. at 651 (citation omitted). Section 5328(a) of the Child Custody Act sets forth a list of sixteen (16) factors that trial courts must consider "in a best interests of the Child analysis in making any custody determination." E.D. v. M.P., 33 A.3d 73, 79-80 (Pa. Super. 2011) (citing 23 Pa.C.S.A. § 5328(a)).

Accordingly, when a party files a petition for modification of a custody order, the trial court must perform a 'best interests of the Child' analysis considering all of the section 5328(a) factors. The sixteen factors listed in section 5328(a) that trial courts must consider include:

30

(a) Factors. -- In ordering any form of custody, the court shall determine the best interest of the Child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the Child, including the following:

(1)  Which party is more likely to encourage and permit frequent and continuing contact between the Child and another party?

(2)  The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the Child or an abused party and which party can better provide adequate physical safeguards and supervision of the Child.

(3)  The parental duties performed by each party on behalf of the Child.

(4)  The need for stability and continuity in the Child's education, family life and community life.

(5)  The availability of extended family.

(6)  The Child's sibling relationships.

(7)  The well-reasoned preference of the Child, based on the Child's maturity and judgment.

(8)  The attempts of a parent to turn the Child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the Child from harm.

(9)  Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the Child adequate for the Child's emotional needs?

(10)  Which party is more likely to attend to the daily physical, emotional developmental, educational and special needs of the Child?

(11)  The proximity of the residences of the parties.

(12)  Each party's availability to care for the Child or ability to make appropriate Child-care arrangements.

(13)  The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a Child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14)  The history of drug and alcohol abuse of a party or member of a party's household.

(15)  The mental and physical condition of a party or member of a party's household.

(16)  Any other relevant factor.

31

23 Pa. C.S.A. § 5328(a).

"Relocation" is defined under the Custody Act as "[a] change in residence of the Child which significantly impairs the ability of a non-relocating party to exercise custodial rights." 23 Pa.C.S.A. § 5322(a). Further, under Section 5337(h) of the Custody Act, the legislature has set forth additional the factors the trial court must consider in deciding whether to grant relief to a parent who seeks to relocate with a Child. Thus the Act requires the court to analyze both the best interests of the Child and the relocation factors which focus upon the "potential advantages of the proposed move and the likelihood that the move would substantially improve the quality of life for the custodial parent and the Children" originally set forth in *Gruber v. Gruber*, 400 Pa.Super. 174, 583 A.2d 434, 439 (1990), which are now in better focus by the ten factors listed in subsection 5337(h). Thus, the trial court must consider both the sixteen "best interest" factors, along with ten the factors set forth in subsection 5337(h) to resolve a request to relocate. See *E.D. v. M.P.*, 33 A.3d 73, 80 (Pa. Super 2011). In arriving at its decision concerning relocation, the trial court must consider the factors contained in § 5337(h) and give "weighted consideration to those factors which affect the safety of the Child." See *C.M.K. v. K.E.M.*, 45 A.3d 417, 421 (Pa. Super. 2012).

The relocations factors set for in 23 Pa.C.S.A. § 5337(h) are as follows:

(h) Relocation factors. In determining whether to grant a proposed relocation, the court shall consider the following factors, giving weighted consideration to those factors which affect the safety of the Child:

(1) The nature, quality, extent of involvement and duration of the Child's relationship with the party proposing to relocate and with the nonrelocating party, siblings and other significant persons in the Child's

32

life.

(2) The age, developmental stage, needs of the Child and the likely impact the relocation will have on the Child's physical, educational and emotional development, taking into consideration any special needs of the Child.

(3) The feasibility of preserving the relationship between the nonrelocating party and the Child through suitable custody arrangements, considering the logistics and financial circumstances of the parties.

(4) The Child's preference, taking into consideration the age and maturity of the Child.

(5) Whether there is an established pattern of conduct of either party to promote or thwart the relationship of the Child and the other party.

(6) Whether the relocation will enhance the general quality of life for the party seeking the relocation, including, but not limited to, financial or emotional benefit or educational opportunity.

(7) Whether the relocation will enhance the general quality of life for the Child, including, but not limited to, financial or emotional benefit or educational opportunity.

(8) The reasons and motivation of each party for seeking or opposing the relocation.

(9) The present and past abuse committed by a party or member of the party's household and whether there is a continued risk of harm to the Child or an abused party.

(10) Any other factor affecting the best interest of the Child.

23 Pa.C.S.A. § 5337(h).


## DISCUSSION

We will now address the custody factors at issue in relocation disputes.

I.      Best Interest factors set forth in Section 5328(a):

(1)     **Which party is more likely to encourage and permit frequent and continuing contact between the Child and another party?**

Testimony established that Mother and Father are antagonistic. The parties generally restrict their communication to text messages and often the exchanges are accusatory and negative. Their actions and attitude toward each other demonstrate an inability to successfully co-parent. Still, even though Mother is unwilling to allow Father any make up or expanded time outside the limitations of the Custody Order, the record suggests that for the most part, the parties respect the custody schedule and their responsibilities set forth in the Custody Order.

Ultimately, Father appears to recognize Mother's importance to Child, as Father testified that, other than Mother's refusal to allow Father make up or expanded time with Child, he viewed Mother to be a good Mother and recognized Child's bond to Mother. Mother on the other hand remained consistent in her testimony that she views Father as uninvolved with Child, undeserving of quality time with Child, and that he is intent on "murdering" Mother.

(2)     **The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the Child or an abused party and which party can better provide adequate physical safeguards and supervision of the Child.**

Both parties allege emotion abuse and physical intimation during the disintegration of their marriage. In fact, both parties claim that at various points, the other physically assaulted them, however, there was no testimony about striking or injuries that appeared credible.

Shortly after the parties agreed to pursue a divorce, they filed competing PFA's. Father's was dismissed, while Mother's was granted apparently on the basis of the testimony of the therapist, that Father fantasized shooting Mother if she would attack him or break into his house. Although we note that Father never delivered that message directly to Mother, his discussion with the therapist was concerning. In Father's defense, he asserts that it was a conditional threat based on his fear that Mother would attack him, rather than as an intentional threat of unilateral action against Mother.

While one might be able to debate the factual support for the PFA, we accept the ruling as it stands and regardless, agree that even as conditional threats to Mother, they support a concern about future violence.

However, the domestic violence issues appear to be ultimately weapons used by each party to gain an advantage in this litigation and perhaps were generated from the stress or emotional difficulties arising out of the initial break up. Since the entry of Mother's PFA, the parties have interacted together successfully with no violence or threats of violence other than their exchange of insults related to this custody litigation.

34

We heard the Child's testimony and the various complaints raised by the parties against each other, and there is no claim by the Child or any credible evidence to suggest any harmful action or abusive behavior by either of the parents other than vague claims of parental alienation.

**(3)    The parental duties performed by each party on behalf of the Child.**

The record suggest that Mother is the primary caregiver for this Child as Father's time is limited to a weekly dinner visit and every other weekend with the Child.

It is clear from Father and Child's testimony that Father provides appropriate care and is engaged during his custodial times. However, it is also clear that Mother adequately provides primary parental care to the Child

**(4)    The need for stability and continuity in the Child's education, family life and community life.**

The relocation petition threatens the continuity and stability of Child's current life. Should Mother relocate, Child would have to attend different school and recalibrate her life not only with regard to her friendships but also with regard to the quality of time she gets to spend with Father.

Another concern we have is with regard to the Child's education. It is apparent that Mother is not as committed to Child's educational needs as Father is. It is apparent from Father's testimony that he recognizes and is concerned about Child's struggles with reading. Mother on the other hand appeared less concerned and relies on a teenage babysitter for any possible educational support that Child needs.

**(5)    The availability of extended family.**

Primarily, each parent identified one extended family member as a constant in the Child's life. Father resides with his mother (paternal grandmother of Child). Paternal grandmother of Child assists with transportation and caretaking for Child when in the Father's home. With regard to Mother, Mother's adult daughter by a prior relationship frequently visits Mother's home and has a good relationship with Child.

Other than that, testimony established that Child has come contact with "cousins" or other family members on occasion.

Interestingly, even though Mother claims that she is returning to New Jersey because that is where she has extended family and Mother brought several witnesses from New Jersey to testify on her own behalf, none were extended family members other than her daughter. Further, there was no testimony about significant contact that Child has with her cousins, other than several references that she would if she lived in New Jersey, she would be able to see her cousins more often.

### (6) The Child's sibling relationships.

Child has only one sibling, her adult half-sister Crystal, who lives in New Jersey. Child is bonded to and very much enjoys spending time with Crystal.

### (7) The well-reasoned preference of the Child, based on the Child's maturity and judgment.

Obviously the Child is of tender years. However, she seemed to be very candid with regard to her relationships.

Child had good things to say about both Mother and Father. She felt loved by both and was suitably bonded with both parents. However, it is of note that Child indicated she preferred Mother's house to Father's house. Based on Child's testimony, the preference was apparently based on the additional social interaction in Mother's home. Child has friends that come to Mother's home and she can visit in Bangor. Mother also receives Childcare assistance from a teenager who lives in the neighborhood and spends significant time during the week with Child. Further, Mother often has weekend visitors in her house. Mother's house seems to be more socially active and exciting.

With regard to Father's home, Child's testimony seems to indicate that the bulk of her visitation in Father's home is with Father as paternal grandmother often leaves them alone. Father seems to be Child's primary playmate during his custodial visits. Father did indicate that he attempts to do things with Child and sometimes includes the children of a cousin of his but we were struck by Child's testimony as an indication that she feels somewhat isolated in Father's home.

### (8) The attempts of a parent to turn the Child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the Child from harm.

We received no indication from Child or Father than he is actively involved in attempting to alienate Child from Mother. Father's testimony seems to indicate

36

only his hunger for additional time with his daughter.

Mother, on the other hand, was antagonistic and insulting of Father, such that we question her motivation to relocate and also her desire to denigrate Father which, apparently is done in front of Child.

We were especially struck by Exhibit 13 which is a photograph of Mother's shrine or trophy in the corner of a hallway. Under a big heart with S___'s name is the Divorce Decree propped up on some type of crystal knickknack with an apparent breast cancer awareness ribbon attached. It appears to be a shrine that Mother placed in a common area in the house displaying her divorce as if it is a trophy. That photograph was sent to Father, likely for the only reason to antagonize him, and according to Father's testimony, Father reasonably believes that it was Mother's attempt to vilify Father to his daughter.

**(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the Child adequate for the Child's emotional needs?**

Based on Child's testimony, it is clear that she is bonded with both parents. Further, both parents, despite any of their personality deficits, seem genuine with regard to their desire to maintain a loving, consistent and nurturing relationship with Child.

Frankly, Father appears to be the more common stable person. Mother comes across as an angry, vindictive spouse and further, her testimony at times suggests that she is not credible.

**(10) Which party is more likely to attend to the daily physical, emotional developmental, educational and special needs of the Child?**

The Child has no unusual needs, other than apparently her education struggles. Father believes that the Child lacks focus because the Child may have attention deficit disorder (ADD). He also appears to be more in tuned to providing reading support for Child and further, to remain on top of Child's school work. With regard to Mother, she appears to lack the same level of concern about Child's educational needs.

**(11) The proximity of the residences of the parties.**

37

Currently, the parties live within several miles of each other in the same school district. Obviously, their close proximity would generally support co-parenting and an expansive schedule for Father, however, the antagonism between the parties makes it difficult for these parents to work together.

**(12) Each party's availability to care for the Child or ability to make appropriate Child-care arrangements.**

Childcare did not appear to be an issue. Even though Mother is a stay at home parent, she apparently relies on babysitting, tutoring and Childcare from a teenager. Further, Mother has frequent weekend visitors to the house, including her daughter, friend, Cynthia, and her fiancé, Alan, to keep Child engaged while Child is in her home.

As we noted previously, the Child appears to be more isolated at Father's home in that her interaction is primarily with Father during her visits to his home. Father does not apparently need Childcare arrangements but if he did, his mother also resides in the house.

**(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a Child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.**

This is a high conflict family, especially with regard to Mother's attitude towards Father. Mother's attitude makes co-parenting not possible at this point. We also believe that Mother is unreasonable with regard to her attitude about co-parenting, Father's make up visits, or any extended time with Father. Mother refuses to acknowledge that Child is bonded to Father and that Child's relationship with Father is worthy of more respect from Mother.

**(14) The history of drug and alcohol abuse of a party or member of a party's household.**

Apparently, Mother has had a history of substance abuse, but has been sober throughout her relationship with Father.

This is a non-issue.

**(15) The mental and physical condition of a party or member of a party's household.**

38

Father appears to be calm, stable and high functioning with regard to his daily life. Mother, on the other hand, based on her testimony and other evidence, suggests that she is high strung and histrionic. However, Mother does not appear to have any significant personality disorders other than her current antagonism to Father. Mother is disabled as a result of her cancer diagnosis, however, she appears to be physically capable of performing her Childcare functions. In addition, she has the support of others as apparently Mother has bouts of fatigue related to her treatment.

(16) Any other relevant factor.

None

II. Relocation factors set for in 23 Pa.C.S.A. § 5337(h):

(1) The nature, quality, extent of involvement and duration of the Child's relationship with the party proposing to relocate and with the non-relocating party, siblings and other significant persons in the Child's life.

There are no siblings, nor does there appear to be any significant extended family members other than paternal grandmother and Child's older half-sister, which Child currently sees on nearly a weekly basis. While Mother argues that if she moves to New Jersey, she will be closer to her adult daughter, Child's half-sister and, the move would make visitation even easier, it is also clear that between daughter's visits to Bangor and Mother's visits to New Jersey, there is frequent contact with her half-sister now.

Therefore, it appears that the relocation will damage or negatively impact Father's ability to see daughter and, therefore, his relationship with daughter without any significant benefit to Child with regard to Child's extended family member's on Mother's side, who she frequently visits in New Jersey or come to Pennsylvania now.

Therefore, relocation does not appear to benefit Child.

(2) The age, developmental stage, needs of the Child and the likely impact the relocation will have on the Child's physical, educational and emotional development, taking into consideration any special needs of the Child.

39

Given the age of the Child, our opinion is that more frequent contact with both parents is preferable. Therefore, relocating to New Jersey will only diminish Father's relationship with Father, without providing any significant benefit to her family relationships should she move to New Jersey.

Given the age of the Child, the distance between the households and Father's commuting schedule, the feasibility of preserving Child's relationship with Father, the non-relocating party, would not be good, should we grant Mother's petition

Frankly, if we would grant the petition, the only benefit to the relocation would be to Mother in that she will be successful in isolating Child from Father, which appears to be her dominant motive for relocation.

> **(3) The feasibility of preserving the relationship between the non-relocating party and the Child through suitable custody arrangements, considering the logistics and financial circumstances of the parties.**

We view possible alternative custody schedules during the school year to be inappropriate for purposes of allowing Father to preserve and to continue to develop his bond with his daughter.

> **(4) The Child's preference, taking into consideration the age and maturity of the Child.**

Given the Child's age, the Child did not express significant preference other than she wanted to remain in Mother's care.

It was also clear that Child does like the social interaction she enjoys while she is in Mother's care and, given Mother's frequent trips to New Jersey or Cynthia and daughter's trips to Pennsylvania, Child already has frequent and continued contract with the people in New Jersey that Mother believes should be important extended family members in Child's life.

Thus, there does not appear to be a significant benefit to Child for the relocation to New Jersey.

> **(5) Whether there is an established pattern of conduct of either party to promote or thwart the relationship of the Child and the other party.**

40

As stated above, it is clear that rather than promote Father's relationship with Child, Mother seems intent to denying Father access to Child and diminishing Father's role in Child's life.

## (6) Whether the relocation will enhance the general quality of life for the party seeking the relocation, including, but not limited to, financial or emotional benefit or educational opportunity.

Mother presented no quality factors with regard to her life or Child's life with regard to a move to New Jersey, other than Mother's desire to be closer to her friends in New Jersey. Frankly, we were shocked that Mother did not call any of her family members to testify on her behalf, other than her daughter, with regard to the extended family benefits presented by relocation to New Jersey. Further, as Mother is unemployed, and does not have employment prospects available to her in New Jersey now, the move right now does not benefit Mother financially other than the prospect that Mother will be able to marry her fiancé, who has up until this point, been very generous with Mother by periodically paying significant bills on Mother's behalf, including legal fees, car expenses. However, if for some reason the relationship with Alan does not materialize into marriage or quickly disintegrates after marriage, it would appear that there would be a financial detriment to Mother and Child rather than a benefit to the New Jersey relocation.

## (7) Whether the relocation will enhance the general quality of life for the Child, including, but not limited to, financial or emotional benefit or educational opportunity.

We do not see a benefit to the relocation to Child based on the record made. However, the reverse is true, that the move to New Jersey will likely diminish Child's contact with Father. We view this as the biggest concern and issue, the negative impact of relocation on one of the parents, with no apparent benefit to the New Jersey move for Child. The move only benefits Mother's social contacts.

## (8) The reasons and motivation of each party for seeking or opposing the relocation.

Father wants to maintain constant presence in Child's life, so he opposes relocation. Father complaints that the move to New Jersey will make it impossible for him to have his weekly dinner visits and further, the transportation will impact the quality of his time and content of his visit with daughter.

41

Mother's motivation can be distilled down to her desire to be closer to her preferred social contacts. The people who came to testimony at Mother's trial, other than her older, adult daughter, were social friends who Mother apparently wishes to have closer contact with. There was no testimony about significant contact with extended family members, no financial benefit in that she is unemployed and will remain unemployed, on disability, and her purported reason is that she has an impending marriage to her fiancé, Alan, as the basis for her relocation. She presented no financial testimony about her situation, nor did Alan when he testified until the Court spent some time talking to him about the financial impact of the relocation. It was at that time that Alan disclosed that over the past year, he has supported Mother, prior to their engagement, with approximately $30,000.00 earmarked for attorney's fees, the acquisition of automobile and automobile related expenses, some home improvement money, and other expenses. Clearly, he was in a position of a sugar daddy prior to their engagement and he is prepared to continue to support Mother. However, Alan's willingness to invest in Mother, was not mentioned by Mother during her testimony. The fact that prior to filing her relocation petition to Alan's residence, Mother wanted to reside at Cynthia's house, indicates to us that the move to New Jersey has nothing to do with finances or any other reason other than Mother wants to be closer to her social circle.

Further, Mother's prior threats to relocate when she is frustrated with her custody issues or exchanges with Father, indicates to us that she has been harboring the possibility of relocation as a weapon against Father.

For these reasons, we see Mother's decision to relocate as impure at best and perhaps more significant retaliatory against Father in an effort to undermine his bond with Child.

> (9) The present and past abuse committed by a party or member of the party's household and whether there is a continued risk of harm to the Child or an abused party.

As stated above, this is not a factor with regard to this relocation decision.

> (10) Any other factor affecting the best interest of the Child.

None.

## CONCLUSION

It appeared that of the two parties, Mother was the least credible. The record also supports Father's claim that Mother was hostile, negative and/or difficult and that Mother is unwilling to co-parent or allow Father make up time, let alone additional time, with Child.

However, it is equally clear that Father harbors much resentment to Mother relating to what he believes to be her unwillingness to allow him to be a co-equal parent.

Mother's Petition for Relocation is not supported with a traditional record of support for the best interest of Child. Mother presented no detailed record with regard to her current financial situation or her anticipated economic benefits from relocation. Frankly, the only detailed testimony and evidence regarding economic benefits, was from Mr. Heisinger, who clearly has been (what people often refer to as) a "sugar daddy" for Mother over the last year or so.

No detailed record was made with regard to Mother's extended family or how the move to Mr. Heisinger's house in South Amboy, will enhance Child's family contact, other than Mother's general and bald assertion that Child will be closer to her family in New Jersey.

In fact, throughout her testimony, Mother's primary focus appeared to be advancing her theory that Father is uninvolved, unsupportive, and unworthy of additional contact with Child. Mother's theory is not supported by either co-parenting counselor. In fact, Mr. Daniels was very supportive of Father and his efforts in counseling. However, according to Mr. Rusche's report and Mother's testimony, she viewed Mr. Daniels efforts negatively. Both counselor's also interviewed Child, nearly a

43

year part, and both reports indicate that Child was very positive with regard to her bond with Father and her enjoyment of spending time with Father.

Further, we see the relocation as having a significant negative impact to the bond between a Father and his young Child. Clearly, Father has been diligent and protective of his custodial times, despite the fact that he lives approximately 3 hours away from his work, and despite his horrific daily commute, makes his midweek dinner visits and his weekend visits all the time and further, has made arrangements with his employment that he can reasonably expand his time with Child. Although we understand through Child's eyes, her time with Mother is more exciting and more socially active, we also recognize from Child's testimony that she is bonded with Father and does enjoy his attention. Therefore, we are concerned about the negative impact the relocation might have on Child's relationship with her Father.

We do not want to ignore Mr. Heisinger, who at this point is destined to formally become part of Child's family in the role of step-father. Mr. Heisinger impressed the court as being a reasonable, mature, caring, well-intentioned and responsible person. We have no issues with his addition to Mother's family, as we would expect his addition to have a positive effect on Child and Mother. However, advancing a relocation petition primarily on the theory of an impending marriage to a nice person, is only one of many factors for this Court to consider and by itself, it does not outweigh the likely and expected damage caused by isolating Child from her Father, with whom Child she is very bonded and enjoys her custodial periods.

Further, although we see Mr. Heisinger as genuine and based on the record, unimpeachable as far as a future resource for Child, given this record, Mother's

44

demeanor and apparent motivations, we feel somewhat uneasy with regard to the purity of Mother's request for relocation or her decision to remarry given that as soon as she learned that her first petition to relocate to her married friend Cynthia's, who lives with her husband and Children, was not likely to be a viable option, she immediately became engaged to pursue a new plan. Besides the fact that this new plan is likely only marginally better than her first, all of Mother's testimony is suspicious and unreliable, therefore, we received and continue to view some of her claims (after carefully reviewing her evidence submitted in support of the petition) with a suspicious eye and find it other to be not credible. Mother did not meet her burden for justifying relocation by a preponderance of the evidence.

For these reasons, we believe that relocation with Child is not appropriate.

Although, we believe that Father is entitled to make up time for his lost visit during the pandemic, we did not find that Father met his burden of proof for a finding of contempt, by clear and convincing evidence, that Mother willfully disobeyed the Court Order. Further, his request for makeup time for his custody losses is subsumed in our expanded Order giving Father 4 weeks of summer custody and an additional overnight on Sunday during his regular custodial weekends during the school year. Therefore, we did not enter a finding of contempt against Mother.

Frankly, based on this record, we would have been inclined to provide Father with more generous custodial periods during the school year; however, for two very critical reasons, we did not. The first reason was due to Father's work schedule and his onerous daily commute to West Chester, New York, we had no confidence that Father would be available to provide the time and structure that a 7 year old girl would need.

45

We also could not rely on a general pledge that, if he were given more custodial time, his employer would adjust his work schedule. A five hour round trip commute on school days prevents Father from providing Childcare on weekdays. Further, the four weeks given to Father this summer will be a "trial period" to see if expanding visitation can be consider in future years.

Secondly, and just as important, we note that although the Child testified that she is very bonded with her Father and enjoys her time with Father (and the co-parenting counselor's interviews with Child corroborated her testimony), that Child also expressed a reluctance to expand time with Father. Child provided a good reason for her reluctance. Child's testimony was that Mother's periods are more fun, citing all of her social interactions (her friends in the neighborhood, her teenage baby sister, visits to New Jersey to visit the people in Mother's social network (including Alan, Cynth, her sister Crystal, and cousins on Mother's side) and that Alan, Cynth and Crystal come to Bangor to visit Mother on as well. Obviously, Child's social life in Mother's custody is much more vibrant and fun than in Father's home, where her interaction is by all accounts, is mostly just Child and Father interaction. Learning and planning activities to keep Child engaged is probably an issue that Father needs to work on. We fear that a shared custodial schedule is not in Child's best interest given this record.

Additionally, we would like to extend Father's time with Child but, given his employment commitments, there is a limited window for doing so. We will increase Father's weekend visits to include Sunday overnight, we will give Father additional time in the summer with Child, and expand his visits with Child during the holidays, but frankly, the best we can provide Father is marginal increase in those areas. We also

46

would note to Father that he may be at a disadvantage in that he has not been able to keep Child socially engaged with others during his visitation period and that in the long run Child's isolation with Father might turn out to be the biggest impediment he might have to maintaining meaningful contact with Child.

However, with regard to S      and S     's best interest, it is apparent that while S     loves both parents and enjoys spending time with both parents, S     prefers her Mother's home. It also appears that one of the basis for S    's preference is that Mother has more social activities and a larger social net so that S     interacts with people she enjoys both in New Jersey and in Pennsylvania while in her Mother's care.

Further, it is also apparent that S     is somewhat isolated in Father's home, in that for the most part during the visits, S     is interacting primarily with her Father. Although we are not criticizing Father or suggesting that S     dislikes her visits with Father, because her testimony established that she does enjoy spending time with her Father and that she believes her Father is a good parent, it is also clear that S     does not want to expand her visits with Father at this time.

Thus, while S     does not express a desire to weigh her time with her Mother and Father as her Mother being her favorite or more intensive, it appears that S     much prefers the socialization and the variety of characters in her life while with her Mother.

Further, another concern we have with regard to expanding Father's time, is that the demands in his professional life make it impossible to find that the best interests for S     is to be with her Father full time during the work week as Father's daily commute totals 5 hours, with no significant traffic interruptions and that he is out of the house from

47

6:00a.m.-8:00p.m. which would mean that on days when Father goes into work, he has almost no time to spend with S       Therefore, at this point, we are unwilling to provide him with additional time during the work week.

BY THE COURT:

STEPHEN G. BARATTA, J.

cc: Lauren Sorrentino, Esq.
    Linda Shay Gardner, Esq.

48